UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOHN H. PAGE**, <br><br> Plaintiff, <br><br> v. <br><br> **JOSEPH R. BIDEN**, in his official capacity as President of the United States, <br><br> Defendant. | Case No. 20-cv-104 (CRC) |

## MEMORANDUM OPINION

Plaintiff John H. Page, a resident of the District of Columbia, sues the President of the United States to demand representation in the House of Representatives. Alleging that there is already a state—the State of Columbia—that overlaps geographically with the District, Mr. Page seeks an injunction requiring the President to include Columbia's residents in the congressional apportionment calculation following the decennial census. The President moves to dismiss the Complaint.

The Court concludes that it lacks jurisdiction over this case because the injunction Page seeks is beyond the power of the judicial branch to grant. The Complaint therefore must be dismissed.

### I.  Background

Every ten years, the federal government must conduct an "actual Enumeration"—i.e., a census—of the United States population. U.S. Const. art. I, § 2, cl. 3. After the census, seats in the House of Representatives must "be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed." Id. amend. XIV, § 2.

As the Supreme Court recently explained, "Congress has given both the Secretary of Commerce and the President functions to perform in the enumeration and apportionment process." Trump v. New York, 141 S. Ct. 530, 533-34 (2020).

> The Secretary must "take a decennial census of population . . . in such form and content as he may determine," 13 U.S.C. § 141(a), and then must report to the President "[t]he tabulation of total population by States" under the census "as required for the apportionment," § 141(b). The President in turn must transmit to Congress a "statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained" under the census. 46 Stat. 26, 2 U.S.C. § 2a(a). In that statement, the President must apply a mathematical formula called the "method of equal proportions" to the population counts in order to calculate the number of House seats for each State. [Id.]

Trump, 141 S. Ct. at 534.[1]

The District of Columbia has never been treated as a "state" for apportionment purposes and therefore has never received any seats in Congress. See Compl. ¶ 13; Adams v. Clinton, 90 F. Supp. 2d 35, 47 (D.D.C. 2000) (concluding, based on "[a]n examination of the Constitution's language and history, and of the relevant judicial precedents," that D.C. is not a state for apportionment purposes).

---

[1] The Bureau of the Census, an agency within the Department of Commerce, recently completed its data-collection operations for the 2020 Census and is in the process of preparing state-by-state population totals for the Secretary of Commerce to report to the President. See Nat'l Urban League v. Ross, No. 20-CV-05799-LHK, 2020 WL 7643237, at *28 (N.D. Cal. Dec. 22, 2020) ("Data collection stopped on October 15, 2020, and accelerated data processing is well underway."); Hansi Lo Wang, Census Numbers For Dividing Up House Seats Delayed Until April 30, Bureau Says, NPR (Jan. 27, 2021), https://www.npr.org/2021/01/27/961247853/census-numbers-for-dividing-up-house-seats-delayed-until-april-30-bureau-says. The Court takes judicial notice of the status of the 2020 Census but does not rely on it to resolve the instant motion.

Proceeding *pro se*, Page filed this lawsuit in January 2020 against a single defendant: the President of the United States. Compl. ¶ 13.[2] In the Complaint, he concedes that D.C. as such is not a state. Id. ¶ 17. However, he alleges that there is a "State of Columbia," distinct from the District, that is constitutionally entitled to representation in Congress commensurate with its population. Id. ¶¶ 26-27, 37. According to Page, Columbia "joined the Union as part of Maryland in 1788" and was later partitioned from Maryland, thus becoming a separate state. Id. ¶ 3. Page points to the 1801 Act Concerning the District of Columbia ("1801 Organic Act"), which provides that "the laws of the state of Maryland, as they now exist, shall be and continue in force in that part of [D.C.] which was ceded by that state to the United States." 2 Stat. 103, 104-05 (1801).[3] He claims that by enacting this law, Congress recognized a new state "with the same sovereign State laws of the State of Maryland as they were then." Compl. ¶ 18. The Complaint seeks "an order of the court requiring the occupier of the Office of President to immediately correct all census returns to show the State of Columbia" and requiring "immediate transmittal of those amended census returns to Congress." Id. ¶¶ 39-40.

The President moved to dismiss the Complaint for lack of subject matter jurisdiction and for failure to state a claim on which relief can be granted. Page filed an opposition to that motion, the President replied, and Page filed a proposed surreply.[4]

---

[2] The Complaint was filed against then-President Donald J. Trump in his official capacity. President Joseph R. Biden is automatically substituted as the defendant under Federal Rule of Civil Procedure 25(d).

[3] "Since 1847 the District has consisted only of that part ceded by Maryland." Clawans v. Sheetz, 92 F.2d 517, 519 (D.C. Cir. 1937).

[4] Having considered the arguments made in Page's proposed surreply, the Court will grant leave to file it.

3

## II. Legal Standards

The Court must dismiss any claim over which it lacks subject matter jurisdiction. Auster v. Ghana Airways Ltd., 514 F.3d 44, 48 (D.C. Cir. 2008). The plaintiff bears the burden of establishing jurisdiction. Knapp Med. Ctr. v. Hargan, 875 F.3d 1125, 1128 (D.C. Cir. 2017). On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but need not "assume the truth of legal conclusions" in the complaint. Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016) (internal quotation marks omitted). The Court also "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Ordinarily, "when an action is filed challenging the constitutionality of the apportionment of congressional districts," the district judge to whom the case is initially assigned should convene a three-judge district court. 28 U.S.C. § 2284(a). However, "[a] three-judge court is not required where the district court itself lacks jurisdiction of the complaint or the complaint is not justiciable in the federal courts." Shapiro v. McManus, 577 U.S. 39, 44-45 (2015) (quoting Gonzalez v. Automatic Emps. Credit Union, 419 U.S. 90, 100 (1974)). Therefore, the three-judge-court statute presents no barrier to this Court considering the President's jurisdictional arguments for dismissal.

---

Page has also moved for summary judgment. However, the Court stayed briefing on the summary judgment motion pending resolution of the President's motion to dismiss. See Minute Order (May 22, 2020). Because the Court now grants the motion to dismiss, Page's motion for summary judgment will be denied.

4

### III. Analysis

The President offers numerous arguments for dismissal.  One is that the Court lacks jurisdiction to grant the sole remedy Page seeks—an injunction requiring the President to include the population of "Columbia" in the census figures used to reapportion Congress.  Mem. in Support of Mot. to Dismiss 6.  The Court agrees and will dismiss the case on this ground without reaching the President's other arguments.

For the Court to have jurisdiction over an action, the plaintiff must have standing under Article III of the Constitution.  Grocery Mfrs. Ass'n v. EPA, 693 F.3d 169, 174 (D.C. Cir. 2012).  "To establish Article III standing, a party must establish three constitutional minima: (1) that the party has suffered an injury in fact, (2) that the injury is fairly traceable to the challenged action of the defendant, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Id. at 174 (internal quotation marks omitted).  The redressability element of standing is not satisfied if the relief the plaintiff seeks is "impossible" for the court to grant.  Newdow v. Roberts, 603 F.3d 1002, 1010 (D.C. Cir. 2010).

Page's Complaint seeks just one remedy (an injunction) against one defendant (the President).  See Compl. ¶¶ 39-40.  At the outset, this request necessarily "raise[s] judicial eyebrows" because any "grant of injunctive relief against the President himself is extraordinary."  Franklin v. Massachusetts, 505 U.S. 788, 802 (1992) (plurality op.).  Courts generally "do not have jurisdiction to enjoin" the President.  Newdow, 603 F.3d at 1013; see also Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996) (explaining that an injunction against the President "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers").

The Supreme Court has "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." Franklin, 505 U.S. at 802 (plurality op.) (citing Mississippi v. Johnson, 71 U.S. (4 Wall.) 475, 498-99 (1866)). But that potential opening for injunctive relief against the President is narrow: "A ministerial duty . . . is one in respect to which *nothing* is left to discretion. It is a *simple, definite* duty, arising under conditions admitted or proved to exist, and imposed by law." Johnson, 71 U.S. (4 Wall.) at 498 (emphases added). Any presidential duty that "involves judgment, planning, or policy decisions" is "discretionary" and cannot be directly enforced through an injunction. Swan, 100 F.3d at 977 (quoting Beatty v. Washington Metro. Area Transit Auth., 860 F.2d 1117, 1127 (D.C. Cir. 1988)); see also Johnson, 71 U.S. (4 Wall.) at 499 (courts lacked power to enjoin President's implementation of an allegedly unconstitutional statute that imposed "executive and political" duties on the President).

Assuming without deciding that courts do have authority to enjoin the President to perform purely ministerial acts, it is nevertheless clear that the Court lacks the power to grant the injunction Page seeks. That is so because Page is asking the Court to order the President to perform more than a mere ministerial duty.

The President's role in congressional apportionment has both discretionary and ministerial aspects. Initially, the President has substantial, though not unlimited, "authority to direct the Secretary [of Commerce] in making policy judgments that result in 'the decennial census.'" Franklin, 505 U.S. at 799. For example, after receiving the Secretary's report of state population totals under 13 U.S.C. § 141(b), the President may take issue with certain technical procedures the Secretary used to produce those figures, and therefore may (within constitutional and statutory limits) instruct the Secretary to revise the numbers in the § 141(b) report. See

Franklin, 505 U.S. at 798.  Such presidential supervision of the census is "not merely ceremonial or ministerial."  Id. at 800.  Eventually, however, the process of determining each state's census population must end, and the President must feed the resulting numbers into the mathematical formula for apportionment.  Unlike the enumeration process that precedes it, "the apportionment calculation itself" is ministerial in nature.  Id. at 799; see also New York v. Trump, No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5422959, at *25 (S.D.N.Y. Sept. 10, 2020) ("[O]nce the final decennial census data is in hand, the President's role is purely 'ministerial.'" (quoting Franklin, 505 U.S. at 799)), rev'd on other grounds, 141 S. Ct. 530 (2020).

Page's request for an injunction ordering the President "to immediately correct all census returns to show the State of Columbia," Compl. ¶ 39, implicates the President's non-ministerial role as a supervisor of the census.  Even indulging the premise that Columbia is a state and the President therefore has a constitutional duty to ensure that it is included in the apportionment figures, this duty would not be ministerial because it would not be so "simple" and "definite" as to leave "nothing . . . to discretion."  Johnson, 71 U.S. (4 Wall.) at 498.

To comply with a court order to "correct all census returns to show the State of Columbia," Compl. ¶ 39, the President would need to obtain a population figure for Columbia from the Secretary of Commerce.  As with other census matters, the President would supervise the decisions made by the Secretary in the process of determining that population figure.  Those decisions would not be trivial.  Although the Census Bureau has already collected responses to the 2020 Census from households throughout the U.S., including in D.C., the task of turning individual census responses into state population totals of suitable quality for use in apportionment is complex.  This post-data-collection stage of the census, known as "data processing," see Nat'l Urban League, 2020 WL 7643237, at *2, involves discretionary judgment

calls about, for example, how to fill gaps in the raw data and how to respond to any anomalies that suggest inaccuracies in census responses. See Utah v. Evans, 536 U.S. 452, 457 (2002) (Census Bureau acted within its discretion where it "filled in certain gaps in its information and resolved certain conflicts in the data" through "hot-deck imputation"). Thus, if the Court were to issue the injunction Page requests, it would not then be "foreordained" how many Columbia residents would be reflected in the final census data, nor would the President's role in determining the result be "merely ceremonial or ministerial." Franklin, 505 U.S. at 799-800. Accordingly, the Court lacks jurisdiction to grant such an injunction.

As already noted, the Complaint does not explicitly seek any remedy other than injunctive relief. The Court could perhaps construe the Complaint as implicitly asking for a declaratory judgment against the President, but even then, Page's injury would remain unredressable. For largely the same reasons that it cannot grant Page's requested injunction, the Court lacks the power to issue a judgment against the President declaring that the exclusion of Columbia from apportionment data is illegal. "[S]imilar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment" as well as a request for an injunction. Swan, 100 F.3d at 976 n.1. Therefore, "[a] court—*whether via injunctive or declaratory relief*—does not sit in judgment of a President's executive decisions." Newdow, 603 F.3d at 1012 (emphasis added). To be sure, the D.C. Circuit has submitted the President to declaratory relief on at least one occasion. See Nat'l Treasury Emps. Union v. Nixon ("NTEU"), 492 F.2d 587, 616 (D.C. Cir. 1974). But NTEU is distinguishable because "the NTEU plaintiffs sought to compel the President to perform a *ministerial* act." Ctr. for Democracy & Tech. v. Trump, No. 1:20-cv-01456 (TNM), 2020 WL 7318008, at *9 (D.D.C. Dec. 11, 2020).

One additional matter remains to consider: whether the Court should constructively amend the Complaint to add a defendant, such as the Secretary of Commerce, against whom the Court does have power to order relief. Such an amendment is within the Court's discretion and might fix the redressability problem with the current Complaint. See Adams, 90 F. Supp. 2d at 44 (citing Swan, 100 F.3d at 979-80). However, no party has requested that the Court amend the Complaint, and the Court does not believe it would be appropriate to do so on its own motion. While the Court has a duty to construe *pro se* pleadings by nonlawyers liberally, Oviedo v. Washington Metro. Area Transit Auth., 948 F.3d 386, 392 (D.C. Cir. 2020), it should also strive to construe them faithfully. That is particularly so where, as here, the *pro se* party's filings are relatively sophisticated and thoughtfully drafted. Page likely made a conscious choice not to sue any subordinate executive branch officials, and the Court should not lightly override that decision. Cf. de Csepel v. Republic of Hungary, 714 F.3d 591, 598 (D.C. Cir. 2013) (noting that "plaintiffs are 'masters of the complaint' with the power to bring those claims they see fit" (quoting Caterpillar, Inc. v. Williams, 482 U.S. 386, 395 (1987))).

More importantly, whatever interests might otherwise weigh in favor of amending the Complaint are diminished here because it seems all but certain that the claim would ultimately prove futile. The Court will not discuss the merits of Page's claim exhaustively, as it is not the role of a single-judge district court to rule definitively on the merits of a challenge to congressional apportionment. See 28 U.S.C. § 2284(a). That said, Page's likelihood of success on the merits would appear very low, even if the Court had jurisdiction.

As Page concedes, no State of Columbia existed when the Constitution took effect. At that time, the geographic area that Page calls Columbia was part of Maryland. See Compl. ¶ 3.

Accordingly, for Page's claim to succeed, he must show that Columbia became a state sometime after the Constitution's ratification.

> The Constitution expressly lays out the requirements for adding a new state to the Union:
>
> New states may be admitted by the Congress into this union; but no new states shall be formed or erected within the jurisdiction of any other state; nor any state be formed by the junction of two or more states, or parts of states, without the consent of the legislatures of the states concerned as well as of the Congress.

U.S. Const. art. IV, § 3, cl. 1. Page alleges that Columbia satisfies the requirements of this constitutional provision: "Columbia was partitioned from the State of Maryland with the U.S. Const. Art. IV consent of Congress and of Maryland with the same sovereign State laws of the State of Maryland as they were then." Compl. ¶ 18. To support this proposition, he relies on the 1801 Organic Act, which provides that "the laws of the state of Maryland, as they now exist, shall be and continue in force in that part of [D.C.] which was ceded by that state to the United States." Id. (citing 2 Stat. at 104-05). Through this statute, Page theorizes, the United States "assented to" the "State Law in Columbia" and recognized the then-existing Maryland Constitution as the state constitution of Columbia, which allegedly remains "in full force and effect" to the extent consistent with Congress's constitutionally delegated power over D.C. Id. ¶¶ 19, 21.

It takes only a glance to see the weaknesses of this argument. The Constitution provides that any "[n]ew states" must be "admitted by the Congress into this union," and more specifically clarifies that the formation of a new state by partitioning an existing state requires the "consent" of Congress. U.S. Const. art. IV, § 3, cl. 1. But Page fails to cite any act of Congress that expresses an intent to admit Columbia into the Union as a new state. The 1801 Organic Act does not fit the bill. While the Act did specify that then-existing Maryland law would "continue in force" in D.C., 2 Stat. at 104-05, that language merely indicates that Congress decided, as a

10

matter of policy, to adopt Maryland law as a starting point for the new body of law governing D.C.  See Bank of Columbia v. Okely, 17 U.S. 235, 242 (1819) ("The laws of the state of Maryland derive their force, in this district, under the first section of the" 1801 Organic Act.).  It hardly follows that Congress meant to recognize a new sovereign state with laws inherited from Maryland.

Perhaps anticipating this problem, Page contends that "Columbia never left the Union" and thus did not need to be "readmitted under a separate admission act."  Compl. ¶ 18 (citing O'Donoghue v. United States, 289 U.S. 516, 540 (1933)); see also Opp'n to Mot. to Dismiss 9 ("Columbia has States rights because it never left the Union, not because of the 1801 Organic Act[;] it has States rights because its people are sovereign and have their own sovereign State law. . . . Columbia's people ratified the U.S. Constitution along with the rest of Maryland on January 30, 1781[.]").  But this misses the point: Columbia cannot be a state if it was never admitted as one, even if the territory and population allegedly comprising Columbia have always been within the Union.  And if Columbia is not a state, it cannot be entitled to congressional seats.  See Adams, 90 F. Supp. 2d at 45-46.

The Court cannot fault Page for being troubled by his exclusion from the census data used to apportion Congress.  "[M]any courts have found a contradiction between the democratic ideals upon which this country was founded and the exclusion of District residents from congressional representation."  Adams, 90 F. Supp. 2d at 72.  Yet, those courts have consistently found themselves unable to provide a remedy, because "it is the Constitution and judicial precedent that create the contradiction."  Id.  Fair or unfair, the law is clear that if the people of D.C. (or Columbia) are to gain the constitutional benefits of state residence, they must do so through a successful campaign to amend the Constitution or admit D.C. as a new state.  Castañon

v. United States, 444 F. Supp. 3d 118, 149 (D.D.C. 2020).  Indeed, Page himself alleges that in a 2016 referendum, 86% of D.C. residents supported "creating a state of 'New Columbia.'" Compl. ¶ 28.  As this allegation suggests, it is widely understood in the local community that the path to congressional representation runs through the political process, not the courts.

In sum, Page lacks standing because his injury cannot be redressed through an injunction or declaratory judgment against the President, the sole defendant named in the Complaint.  The Court will not exercise its discretion to amend the Complaint in order to fix this jurisdictional problem—both because Page has not asked the Court to do so, and because any amendment would almost certainly prove futile, given the manifest frailty of Page's claim on the merits. Accordingly, the Court will dismiss the Complaint.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss.  The Court will further deny Plaintiff's Motion for Summary Judgment and grant Plaintiff's Motion for Leave to File a Surreply.  A separate Order shall accompany this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  January 29, 2021